1

2

3

4

5

6

ENDORSED FILED
SUPERIOR COURT

FEB 10 2016

COWLITZ COUNTY
STACI L. MYKLEBUST, Clerk

7 SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR COWLITZ COUNTY

8

9 D. LAWRENCE OLSTAD,

10                              Plaintiff,

11                  vs.

12 US NATIONAL BANK, NA,  QUALITY
LOAN SERVICE CORPORATION OF
13 WASHINGTON, a Washington Corporation,
and CALIBER HOME LOANS, Inc., a
14 Delaware Corporation.
                              Defendants.

15

No. **16  2  00152  2**

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY
RELIEF**

16                         I. INTRODUCTION

17 1.      This lawsuit seeks injunctive and declaratory relief against an entity or entities

18         threatening to foreclose a trust deed on plaintiffs' real property located at 200 Coyote

19         Lane, Castle Rock, Cowlitz County, Washington to which trust deed defendants are

20         strangers.   Plaintiff challenges defendants' authority to foreclose and the veracity of their

21         justification for attempting to do so.

22 2.      Plaintiff further challenges Quality Loan Service's designation of US Bank as beneficiary

23         of the trust dead on the subject property and the legality of its authority to do so.

24 3.      Finally, any legitimate interest in the subject property that may have inured to defendants,

25         or any of them, is the direct and proximate result of a massive fraud perpetrated by a

26         number of banks, including Washington Mutual Bank (the named beneficiary of the trust

           deed) and private entities on the entire nation and investors around the globe, which fraud

Page 1 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1       p. 3.  The named owner of the deed of trust on its face is Washington Mutual Bank.

2   11. Defendants Quality and Caliber have undertaken to execute a non-judicial foreclosure on

3       the subject property, with a sheriff's sale threatened on February 25, 2016.

4   12. Plaintiff disputed any debt to US Bank on account of the promissory note made payable to

5       Washington Mutual, and Quality responded that it was "successor trustee" and that US

6       Bank, as trustee for LSF8 Master Trust was the "actual holder" of the note.  See Exhibit 2.

7   13. Quality's assertion alleged in paragraph 11 was based on an affidavit styled "Declaration

8       of Beneficiary" in which the term "actual holder" appears and on which term Quality

9       relied.  See Exhibit 3.

10  14. Under Washington law, the Beneficiary is the "holder" of the instrument evidencing the

11      obligation.  RCW 61.24.005(2).  The "holder" is the person or entity *in physical*

12      *possession of the note*, even if that person or entity is identified as the owner on the face of

13      the note.  RCW 62A.1-201(21).

14  15. Despite request, Quality has been unable or unwilling to document any transfer or sale of

15      the note, the trust deed or any supporting document by Washington Mutual to LSF8

16      Master Trust or US Bank NA, from which it purportedly derives its authority, and plaintiff

17      alleges on information and belief that none exists.

18  16. Quality is estopped from asserting or arguing that either US Bank or LSF8 Master Trust is

19      the beneficiary of the trust deed on the subject property on account of its prior assertions,

20      in and out of court, that the beneficiary of the trust deed is Washington Mutual Bank,

21      which assertions were made in Kelly et al v. Quality Loan Service Corporation of

22      Washington, Cowlitz County Superior Court Case. No. 08 2 01392 9.  See Exhibit 4.

23  17. Plaintiff here was also a plaintiff in the case named in paragraph 16, creating an identity of

24      parties.

25  18. Plaintiff alleges on information and belief that the LSF8 Master Participation Trust is a

26      vehicle for the banks in the federal reserve system to reap the benefits of the massive fraud

        they perpetrated in the early years of the 21st century, as further alleged below.

Page 3 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1                V.  RELEVANT GENERAL ALLEGATIONS - CONSPIRACY

2    19.      Beginning at a time unknown to plaintiffs, and continuing through the date of filing,

3           Washington Mutual Bank and others conspired to evade legal regulation and to violate

4           statutes prohibiting racketeering, fraud and profiteering, usury statutes, the Real Estate

5           Sale Procedures Act (RESPA) and other controls in the granting of loans secured by

6           residential real estate mortgages for the purposes alleged below.

7    20.      It was part of this conspiracy that some of the conspirators, including Washington Mutual,

8           agreed to relax and/or ignore standards relating to the credit worthiness and loan

9           worthiness of residential mortgage borrowers knowing that the consequence would be to

10         unnaturally increase the availability of residential real estate secured loans which would

11         drive up residential real estate prices beyond real property values for such real estate

12         among other things.

13    21.    As part of this conspiracy, Washington Mutual Bank deployed in-house appraisers who

14         would appraise residential real properties at inflated values, justifying Washington Mutual

15         in making loans secured by said properties in amounts exceeding the real values of said

16         properties which increased the bubble effect, because, as the coconspirators knew, real

17         estate prices are based on the "fair market value" of the parcel(s) in question - whatever

18         the market will bear - and the market had been manipulated by the coconspirators to

19         maximize the demand for residential real estate mortgages.

20    22.    As part of this conspiracy, and for the purposes ascribed to it, at sometime before 2003

21         Washington Mutual Bank granted and agreed to the acceptance of a mortgage on the

22         subject property using an in-house appraisal with an inflated value justifying Washington

23         Mutual in making loans secured by said property in an amount exceeding the real value of

24         said property which increased the bubble effect, because as Washington Mutual knew real

25         estate prices are based on the "fair market value" of the parcel(s) in question - whatever

26         the market will bear - and the market had been manipulated by the coconspirators to

           maximize the demand for residential real estate mortgages.  A promissory note was made

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1   executed by plaintiff's co-owner and made payable to Washington Mutual, which note

2   was secured by the property that is the subject of this action, for amounts greatly

3   exceeding the uninflated, true value of said property.

4   23.   As part of this conspiracy, Washington Mutual and others originated as many residential

5   real estate mortgages as possible because the conspiracy profited from the selling of the

6   mortgages alleged above as "bundles" to be "securitized" by other coconspirators and

7   bought and sold as "securities" as more fully alleged below.

8   24.   The coconspirators knew that there would inevitably come a time when demand would

9   drop precipitously, when real estate prices would then begin to fall, and that the real estate

10   market would then "deflate," causing real estate prices together with "fair market"

11   property values to plummet.  That effect and the natural attrition from defaults by

12   unqualified borrowers became a wave of defaults by borrowers resulting in a national, and

13   then an international, financial crisis.

14   25.   The coconspirators knew, and intended, that when the effect described in paragraph 19

15   happened, the mortgage backed "securities" which they had sold would be revealed to be

16   worthless or valued at only a fraction of the price for which they had been sold,  the effects

17   on the economy as a whole would include a massive, nationwide degradation of

18   investment wealth and/or loss of income, and a radical tightening of the credit markets

19   making it impossible for great masses of the barely-qualified or under-qualified borrowers

20   who had been created by the conspiracy alleged herein to meet their mortgage payment

21   obligations and financially untenable for others to do so, who, on account of the actions of

22   the coconspirators, owed far more on their mortgages than their properties were worth,

23   and radically decreasing credit available to small businesses, aggravating unemployment

24   and multiplying the number of mortgage defaults.

25   26.   As part of the conspiracy, the coconspirators planned to undertake foreclosures on a

26   massive scale in order to unlawfully and corruptly accrue to themselves an ownership

interest in a large portion of the nation's residential real estate wealth, and in furtherance

Page 5 - *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1   of the conspiracy, and sometimes as part of the "securitization" process, some of the

2   coconspirators established "trusts" and other entities the purpose of which was to generate

3   and complete the planned foreclosures.

4   27.   Defendant Quality Loan Service is just such an entity, established and/or managed as part

5   of the conspiracy alleged above and for the purpose of effectuating its ends.

6   28.   The foreclosure which defendants admittedly intend to pursue against the property that is

7   the subject of this action is part of the conspiracy alleged herein.

8   V.   GENERAL ALLEGATIONS  - SECURITIZATION

9   29.   In 1999, Congress repealed the Glass-Steagal Act.[2]  Pub. L. No. 106-102, 113 Stat. 1338

10   (1999), known as the Gramm-Leach-Bliley Financial Services Modernization Act (GLB).

11   The result was what has come to be known as the Financial Services, or Finance,

12   "Industry."[3]

13   30.   A huge secondary market in mortgage-backed securities (MBS's) sprang up[4] and was fed

14   by an ever-increasing number of less-and-less trustworthy home mortgages, sold to the

15   American public by means of the artificial depression of interest rates by an

16   accommodating, and influential, Federal Reserve Chairman[5] and a mostly sycophantic

17   _____

18   2  There were actually two Glass-Steagal Acts, codified in various sections of Title 12 of the
    United States Code.  The first passed within FDR's first one-hundred days, and the second,
19   passed in June, 1933, was known as the Banking Act of 1935.  The first primarily prohibited the
    hoarding of gold coins and provided for the well-known "bank holiday" of 1933, permitted the
20   Federal Reserve to issue paper currency and separated commercial banking from investment
    banking.  The second imposed regulations on banking across the board.
21

22   3  The finance industry includes a broad range of businesses and entities that deal with the
    creation and management of money. Among these are banks, credit card companies, insurance
23   companies, consumer finance companies, stock brokerages, investment funds and some
    government sponsored enterprises.
24

25   4  The road to this result had been cleared in the mid-1980's by the enactment of "REMIC" (Real
    Estate Mortgage Investment Conduit) provisions in the Internal Revenue Code.  236 USC 860A.
26

    5  What is happening, and by all reliable reports will get much worse, is the consequence of
    monetarist Alan Greenspan's "Revolution in Finance," which unleashed mortgage-backed

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1      board.

2    31.    The resultant, false and ultimately insupportable increase in real property values, together

3        with the artificially depressed interest rates, stimulated a refinance boom of epic

4        proportions that added fuel to the fire.[6]   Untold mischief was done.[7]

5    32.    In June, 2007 the bottom dropped out when Bear Stearns, one of the earth's largest

6        investment banks, pledged to loan one of its embattled hedge funds $3.2B, collateralized

7        with "debt obligations, only to have Merrill Lynch[8] seize $850M of the underlying

8        collateral and auction it off, realizing only $100M.[9]   Thereafter, facts began to emerge

9        about the securitization of mortgages[10] that made foreclosure of a securitized mortgage

10      even more problematic, as more specifically alleged below.

11  ————————————

12  securities created by "securitizing" loans into new bonds, insuring them using insurers known as "monolines" and persuading Moody's and S&P to rate them as AAA, the highest grade.

13  Investors, pension funds and banks everywhere took them to be ultra-safe..

14  6 "Bubbles and Crashes", by Dilip Abreu and Markus Brunnermeier, *Econometrica*, 2003;

15  "Overconfidence and Speculative Bubbles", by Jose Scheinkman and Wei Xiong, *Journal of Political Economy*, 2003.

16  7 On February 1, 2008, the State of Massachusetts filed suit against investment bank Merrill

17  Lynch, for fraud and misrepresentation concerning about $14 million worth of subprime securities sold to the city of Springfield. The complaint focused on the sale of "certain esoteric

18  financial instruments known as collateralized debt obligations (CDOs) . . . which were unsuitable for the city and which, within months after the sale, became illiquid and lost almost all of their

19  market value." Greg Morcroft, "Massachusetts Charges Merrill with Fraud," *MarketWatch*,

20  February 1, 2008. The month before that, Baltimore Maryland sued Wells Fargo Bank for damages from the subprime debacle, alleging that Wells Fargo had intentionally discriminated in

21  selling high-interest mortgages more frequently to blacks than to whites, in violation of federal law. Henry Gomez, Tom Ott, "Cleveland Sues 21 Banks Over Subprime Mess," *The Plain*

22  *Dealer,* Cleveland, January 11, 2008.

23  8 Another global investment bank, also selling wealth management, asset management,

24  insurance, and other related products.

25  9 Walden Siew & ,Al Yoon "Bear Stearns CDO liquidation sparks contagion fears" *Reuters,* June 21, 2007.

26

10 Mark Pittman, "Bear Stearns Fund Collapse Sends Shock Through CDOs," *Bloomberg News Service,* June 21, 2007.

Page 7 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1   33.   In or around October, 2007, courts around the country began to determine, when the

2         question was properly addressed, that "entities," especially "trustees" and "successor

3         trustees" acting on behalf of "beneficiaries," could not if pressed demonstrate that they

4         were indeed empowered to foreclose - that they "owned" the mortgage note. See, e.g.,

5         Exhibit 1 to Complaint.

6   34.   From the year 2000 until the bottom dropped out, all the lenders, defendant included,

7         required of their brokers that loans be configured according to the specifications of "the

8         investors."

9   35.    The securitization process creates entities and security obligations that are completely

10         removed from the agreement between the original lender[11] and the original borrower.

11         Mortgages are "pooled" or "bundled" and then sold *without recourse* to an "issuer" -

12         usually a large corporation or private fund[12] - and converted into "securities" known as

13         Special Investment Vehicles (SIV) or Special Purpose Companies (SPC) or Special

14         Purpose Vehicles (SPV) which are exempt from the Securites Act of 1933 and the

15         Securities and Exchange Act of 1934.  Pub. L. 106-102, Nov. 12, 1999, 113 Stat. 1338

16         (See 12 U.S.C. 1811 note).

17   36.   Various interests in the "securities" are created and sold to investors, whose bargained-for

18         exchange is a share of the income stream from the monthly payments made on the

19         promissory note.

20   37.   The obligation to pay the investors is administered through a "Pooling and Servicing

21

22

23   ─────────────────

24   11  The original lender is known as the "sponsor" or the "originator."

25   12  The US ABS and MBS markets are dominated by relatively few very large entities such as
         FNMA, Freddie Mac, the top-five investment banks (all of which have conduit programs), the
26         top-five credit card issuers (MBNA, AMEX, Citigroup, etc.). Hence the top-five ABS/MBS
         issuers control more than 50% of the US ABS/MBS market which is an illegal market
         concentration.

Page 8  –  *COMPLAINT  FOR  INJUNCTIVE  AND  DECLARATORY  RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1       Agreement" between a "Servicer," and the entity created by the process.[13]   The Servicer

2       collects the payments from the property owner and distributes the payments to the

3       investors after extracting a fee.

4    38.    Typically in non-judicial foreclosure proceedings either the original lender commenced the

5       foreclosure or the Servicer does so as the successor beneficiary under the Original Deed of

6       Trust that had been granted to the lender by property owner.  However where there has

7       been securitization of the underlying obligation, neither the original lender nor the servicer

8       are the beneficiary under the Deed of Trust because 1)  The original lender sold the note to

9       the  Issuer without recourse , and 2) the Servicer is not, and never has been, the owner or

10       holder of the promissory note.    Plaintiffs believe and therefore allege that, after the

11       securitization of the underlying obligation, neither the Originator or the Servicer have the

12       authority to request the Trustee to foreclose the Deed of Trust, and no successor

13       beneficiary or trustee actually possesses the note because it no longer exists.

14      VI.  SECURITIZATION, POSSESSION OF THE NOTE AND WASHINGTON LAW

15                 A. The Trust Deed Foreclosure Act

16    39.    RCW Title 61 Ch. 24 controls foreclosures in the State of Washington.  RCW 61.24.005

17       defines the parties to a foreclosure, and provides in part: "(2)'Beneficiary' means the

18       holder of the instrument or document evidencing the obligations secured by the deed of

19       trust, excluding persons holding the same as security for a different obligation."

20    40.    Only the holder of the note, thus, is empowered to foreclose on the mortgage.

21    41.    The "holder" is the person or entity *in physical possession of the note*, even if that person

22       or entity is identified as the owner on the face of the note.  RCW 62A.1-201(21).

23    42.    RCW 61.24.020 provides that "deed[s] conveying real property to a trustee in trust to

24

25

---

26 13  This process is extremely complex, with "slices" of the risk, known as "tranches" being
created and sold in secondary markets.  At the apex of the pyramid, the fees and bonuses
generated by these transactions and paid to the traders and entities involved in originating the
mortgages and in creating and trading in these securities were astronomical.

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1    secure the performance of an obligation of the grantor or another to the beneficiary may be

2    foreclosed by trustee's sale."

3    43.    RCW 61.24.030 establishes the requisites to a trustee's sale and requires, among other

4    things, that *the beneficiary* declare the borrower or grantor to be in default.  RCW

5    61.24.030(7)(c).

6    44.    Because of the securitization process, as alleged in paragraphs 19 through 28, above, no

7    securitized loan may be the basis for a foreclosure under Washington law as set out in

8    paragraphs 29 through 33, above, because any securitized mortgage is being held to secure

9    the obligation of the issuer to the investors, not the obligation of the original borrower to

10   the original lender.

## B.  Usury

12   45.    Securitization contravenes Washington usury laws (RCW 19.52.020), in that the resulting

13   effective interest rate exceeds the legally allowable rate, in that the effective cost-of-funds

14   for the securitization transaction is not the advertised interest cost of the ABS securities

15   (the investor's coupon rate) but the sum of the following (assuming that the securitization

16   is a transfer of assets):

17   A.  The greater of the sponsor's/originator's annual cost-of-equity (in percentages) or the
     percentage annual cash yield from the collateral;[14]

18   B.  The amortized value cost, or the difference between the market value of the collateral,

19   and the amount raised from the ABS offering before bankers' fees;[15]

---

14  Where the SPV's corporate documents expressly state that the Excess Spread should be paid
to the sponsor, the Excess Spread should be subtracted from the resulting percentage.  The
Excess Spread is the gross cash yield from the Collateral, minus the interest paid to investors,
minus the servicing expense paid to the servicer, minus charge-offs.

15  Which is then amortized over the average life of the ABS bonds at a discount rate equal to
the us treasury bond ate of same maturity and then expressed as percentage of the market value of
the collateral.

Page 10 - *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

C. The amortized[16] total periodic transaction costs, which are and then added to the amortized pre-offering transaction costs[17] to obtain Total Periodic Transaction Cost which is expressed as a percentage of the value of the pledged collateral.

D. Foregone capital appreciation.

46.   Where the securitization of assets is considered a true sale, the financing charge is the sum of the following:

A. The base cost of capital;

B.   Total Periodic Transaction Cost;

C. The Value Difference, or the difference between the market value of the collateral, and the amount raised from the ABS offering (before bankers' fees), amortized over the average life of the ABS bonds and expressed as percentage of the market value of the collateral;

D. Unrealized Losses, amortized over the estimated average life of the ABS, and expressed as a percentage of the book value of the collateral;

E. Foregone capital appreciation.

C. Fraud

47.   Where, in "true sale," "disguised loan" and "assignment" securitizations, the originator[18] (or "sponsor") serves as the servicer,[19] the unavoidable conflict of interest constitutes conversion and fraud, specifically as follows:

A. Misrepresentation of material facts occurs when the sponsor/servicer selects the assets to be transferred to the SPV, and the terms of the offering prospectus misrepresents the level of objectivity and fairness of the servicer/sponsor, and in the event the sponsor/servicer selects collateral for substitution where there are problems and the past and present disclosure statements and ABS offering documents materially misrepresent the sponsor/servicers objectivity and fairness.

---

16 Amortized over the average life of the ABS at a rate equal to the interest rate on an equivalent-term US treasury bond.

17 External costs such as underwriters' commissions/fees, filing fees, administrative costs (escrow, transfer agent, etc.), marketing costs, accountant's fees, legal fees, accounting fees and internal costs incurred solely because of the securitization transaction (costs incurred internally by the sponsor/originator - direct administrative costs, printing, etc.).

18 The entity that deals directly with the borrower.

19 The entity that collects the money from the original borrower.

Page 11 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

B. The specific intent to deceive about the sponsor's/servicer's acts, truthfulness and objectivity/fairness is inherent in the dual role of sponsor/servicer which constitutes a conflict-of-interest and from sponsor/servicer's significant economic, psychological and legal incentives to maximize its profits by: a) delaying substitution of collateral for as long as possible, b) delaying recognition of collateral impairment, and c) substituting impaired collateral with sub-standard collateral.

C. Investors rely heavily, and have a right to rely, on the representations, the structure, the arrangements, the contracts and the disclosure statements in securitizations, which are relatively complex.

D. Losses occur due to the sponsor's/servicer's misrepresentations of its obligations, fairness, objectivity and fiduciary duties because:

   a. Investors' estimates of the values of ABS are inaccurate and too high due to the servicer's/sponsor's misrepresentations;

   b. Investors incur unnecessary trading costs to re-balance their portfolios as the ABS becomes riskier;

   c. Investors and the sponsor/servicer incurs additional monitoring costs whenever there is any report of impairment of collateral or substitution;

   d. In the ABS sales process, the underwriter makes certain representations concerning the effectiveness and predictability of the collection process, and investors relying on such representations may have a securities fraud claim if the servicer fails to perform (i.e., goes bankrupt).

48.   Off-Balance-Sheet Treatment[20] Of ABS in both True-Sale and assignment transactions constitutes fraud, specifically as follows:

A. A misrepresentation of material fact  - that the sponsor has no interest in the assets - occurs when the sponsor removes the assets from its books, whereas consolidation of the SPV in the Sponsor's financial statements is warranted because the sponsor a) retains a residual economic interest in the SPV, b) functions as servicer of the SPV asset pool, which grants the sponsor significant control over the assets and the SPV's operations, and c) determines recognition of impairment of collateral, and selects and provides assets for "substitution" of collateral and d) typically misrepresents the level of objectivity and fairness of the servicer/sponsor in disclosure statements.

B. The misrepresentation alleged above is specifically intentional, as evidenced by the elaborate arrangements and structure of the securitization transaction.

---

20 Most, if not all, securitized mortgages are taken off the originator/sponsor's books.  This has only been permissible if:  (1) The SPV is truly independent of the sponsor and of the directors, fiduciary administrative duties notwithstanding; and (2) the sponsor's transfer of the assets to the SPV are a "true sale" and the sponsor keeps no ongoing economic interest in the assets, and (3) the form and substance are transparently identical, and the structure is not, nor does it appear to be, illusory or deceptive.  Where the sponsor services the loan, these criteria cannot be met.

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1     C.  The sponsor's current and prospective shareholders and other investors have a right to
rely, and do rely heavily on the sponsor's representations about the structure and
2     arrangements of securitizations, the associated disclosure statements and the assurances of
off-balance sheet treatment of SPV debt in securitizations, which are relatively complex.
3     These form the primary source of knowledge and valuation terms for the investor.

4     D.  Loss occurs as a direct and proximate result of the above-alleged sponsor/servicer's
misrepresentations of its obligations because a) investors' estimates of the values of the
5     sponsor's equity are inaccurate and too high due to the servicer's/sponsor's
misrepresentations of the SPV debt, b) investors incur unnecessary trading costs to
6     re-balance their portfolios as the sponsor is deemed more risky, c) the investor and the
sponsor/servicer incurs additional monitoring costs whenever there is any report of
7     impairment of collateral or substitution.

8    49.    Also as a direct and proximate result of all the fraud alleged above, and because of the

9     near universality of the fraudulent practices alleged above, together with the widespread

10     and associated practices of illegally and unconstitutionally creating money out of thin air

11     and artificial manipulation of interest rates, all real property owners are damaged due to

12     the unjustified and insupportable increase in real property values nationwide followed by

13     the inevitable, predictable (and predicted) collapse, and the loss of wealth, and everyone is

14     damaged by the resultant degradation of the currency.

15                  D.  Racketeering

16    50.    "True sale," "disguised loan" and "assignment" securitizations are transactions constitute

17     "predicate acts" under federal RICO statutes (18 USC 1961-1968) as follows:

18     A.  The requisite "enterprise" is composed of the originator, the sponsor/issuer, the
trustees and the intermediary bank, all of whom work together closely to effect the
19     securitization transaction;

20     B.  Predicate acts include using the mails for sending out materials among themselves and
to investors, using wires to engage in fraud by communicating with investors, conversion
21     where there isn't proper title to collateral, misrepresentation of issues and facts pertaining
to the securitization transaction as set forth above, securities fraud inherent in the  false
22     disclosures and non-disclosures alleged above, deprivation of the opportunity to profit,
false and misleading representations about the value of the collateral and undercutting the
23     issuer's ability to pay debt claims or judgment claims in where the originator is financially
distressed and the cash proceeds of the transaction are significantly less than the value of
24     the collateral.[21]

25    ————————————

26  21  Specific United States Code sections implicated are: 18 USC 1341 (prohibits mail fraud), 18
USC 1343 (prohibits wire fraud), 18 USC 1344 (prohibits financial institution fraud), 18 USC
1957 (prohibits engaging in monetary transactions in property derived from specified unlawful

Page 13 - *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1    C. The requisite 'intent' is evident in the knowledge (actual and by inference), acts, omissions, purpose (actual and by inference) and results of the process of securitization.

2

51.    Securitization Constitutes Violations Of United States antitrust laws, as follows:

3

A.  Market Concentration: The US ABS and MBS markets are dominated by ay few large entities such as FNMA, Freddie Mac, the top-five investment banks (all of which have conduit programs), the top-five credit card issuers (MBNA, AMEX, Citigroup, etc.).. Hence the top-five ABS/MBS issuers control more than 50% of the US ABS/MBS market. This constitutes illegal market concentration under US Antitrust laws.

4

5

6

B.  Market Integration: The ABS and MBS markets are national and international, involving geographically-diverse entities and individuals.   Each ABS offering typically involves presentations to investors in various cities, the costs[22] being borne by the underwriter(s) before its fees are paid by the sponsor.  This has two main effects: It reduces competitive pressure on dominant investment banks and groups of investment banks and it raises market-entry barriers by making it more expensive to conduct presentations for new offerings. Hence, the market integration created by the business practices of securities underwriters is anti-competitive and violates the Sherman Act,[23] the Clayton Act[24] and the FTC Antitrust statutes.

7

8

9

10

11

C.  Syndicate Collusion, Price Discrimination and Exclusive Contracts: The syndicates of investment banks used in distributing ABS/MBS collude to determine the price at which each ABS tranche is sold and which investors can purchase different tranches.[25]

12

D.  Price Formation and Price Fixing: The price of ABS securities is often linked to the price/yields of US treasury bonds, distorting the true demand/supply balance for ABS/MBS, and erroneously incorporating the demand/supply relationships of the US Treasury Bond market, into the ABS/MBS markets.  Each active investment bank typically underwrites many offerings simultaneously, and essentially controls the pricing of each new-issue ABS offering.

13

14

15

16

E.  Vertical Foreclosure: In the ABS/MBS markets some investment banks and commercial banks are active in almost all phases of the securitization process, and non-bank entities can use their own asset portfolios and in-house trading desks to participate in almost all aspects of securitization processes.

17

18

19    F.  Tying occurs when sponsors are required to purchase loans, letters of credit, custody services, etc. from the investment bank, in order to effect the securitization transaction, investors are sometimes required to simultaneously purchase two or more tranches of an ABS offering or to promise to buy the same or similar ABS/MBS securities in order to be

20

21

22    activity), 18 USC 1952 (prohibits interstate travel or transportation in aid of racketeering).

23    22 Printing, mailing, traveling and administrative costs increase with the greater geographical dispersion of investors.

24

25    23  15 USC 1 et seq.

26    24  15 USC 12 et seq.

25   An apparent violation of 15 USC 13(2)

Page 14 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

allocated ABS in new offerings and/or the sponsor and or investment bank may formally or informally require investors to purchase minimum dollar volume of ABS in specific offerings in order to get 'allocations' in future offerings. These acts constitute illegal tying.

G.  Predatory pricing occurs when investment banks under-price ABS offerings in order to obtain more investors.

52.  The securitization process necessarily involves the use of void contracts, for reasons including but not limited to the following:

A.  Lack of consideration - many of the contracts used in the securitization process are unilateral, executory contracts for which there is no consideration, illusory promises respecting collateral that has not been acquired or performed and contracts devoid of mutuality, either between the sponsor and the investors or between the investors and the SPV.

53.  All "True-Sale", "Disguised Loan" And "Assignment" Securitizations are illegal[26] tax-evasion schemes, based on the fact that the sponsor determines the price at which the collateral is transferred to the SPV, and hence can lower/increase the price of the collateral to avoid capital gains taxes.

54.   Where, in "true sale," "disguised loan" and "assignment" securitizations, the SPV is or employs a trust, the declaration of the trust is void because the trust is created for an illegal purpose as set forth in this complaint.

55.  Where the employment of void contracts is customary and/ or the purpose of the transactions is illegal, as outline above, the process itself is void as against public policy.

E.  Criminal Profiteering

56.  46. RCW 9A.82.100[27] prohibits, and provides remedies including injunctive relief for,

---

26  Contrary to 26 U.S.C. § 7201. 26 USC Subtitle F, Chapter 75, *inter alia*.

27  (1)(a) A person who sustains injury to his or her person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity, or by an offense defined in RCW 9A.40.100 , or by a violation of RCW 9A.82.060 or **9A.82.080** may file an action in superior court for the recovery of damages and the costs of the suit, including reasonable investigative and attorney's fees. * * * (Emphasis added).
     (2) The superior court has jurisdiction to prevent, restrain, and remedy a pattern of criminal profiteering, or an offense defined in RCW 9A.40.100 , or a violation of RCW 9A.82.060 or 9A.82.080 after making provision for the rights of all innocent persons affected by the violation and after hearing or trial, as appropriate, by issuing appropriate

Page 15 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

orders.
(3) Prior to a determination of liability, orders issued under subsection (2) of this section may include, but are not limited to, entering restraining orders or prohibitions or taking such other actions, including the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to damages, forfeiture, or other restraints pursuant to this section as the court deems proper. The orders may also include attachment, receivership, **or injunctive relief in regard to personal or real property pursuant to Title 7 RCW**.  (Emphasis added).

RCW 9A.82.080, omitting felony level designations, provides:

(1)(a) It is unlawful for a person who has knowingly received any of the proceeds derived, directly or indirectly, **from a pattern of criminal profiteering activity** to use or invest, whether directly or indirectly, any part of the proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.
* * * *
(2)(a) It is unlawful for a person knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property **through a pattern of criminal profiteering activity.**
* * * *
(3)(a) It is unlawful for a person knowingly to conspire or attempt to violate subsection (1) or (2) of this section.  (Emphasis added).


Criminal profiteering activity, in turn, is defined in RCW 9A.82.010 as follows:

(4) "Criminal profiteering" means any act, including any anticipatory or completed offense, committed for financial gain, that is chargeable or indictable under the laws of the state in which the act occurred and, if the act occurred in a state other than this state, would be chargeable or indictable under the laws of this state had the act occurred in this state and punishable as a felony and by imprisonment for more than one year, regardless of whether the act is charged or indicted, as any of the following:
* * * *
    (qq) Mortgage fraud, as defined in RCW 19.144.080.

RCW 19.144.080 provides:

It is unlawful for any person in connection with making, brokering, or obtaining a residential mortgage loan to directly or indirectly:
    (1)(a) Employ any scheme, device, or artifice to defraud or materially mislead any borrower during the lending process; (b) defraud or materially mislead any lender,

Page 16 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1       criminal profiteering.

2    57.    RCW 9A.82.100 prohibits, among other things, the acquisition of " any title to, or any

3       right, interest, or equity in, real property" through a pattern of criminal profiteering

4       activity.

5    58.    The conspiracy alleged herein, including but not limited to the securitization of mortgages,

6       constitutes a pattern of criminal profiteering activity as specifically alleged above.

7    VIII.  ENTITLEMENT TO DECLARATORY RELIEF

8    59.    For reasons including but not limited to those stated here, an actual dispute exists between

9       plaintiffs and defendants, which parties have genuine and opposing interests, which

10      interests are direct and substantial, and of which a judicial determination will be final and

11      conclusive.

12   60.    Plaintiffs are entitled to a declaration that only the "owner" of the underlying obligation

13      (the physical possessor of the Promissory Note ) in question is entitled to foreclose, that

14      the  Deed of Trust  in question may not be foreclosed by any person or entity holding the

15      same as security for "a different obligation" (i.e., from an obligation different than that

16      originally created) and determining what, if any, interest defendant(s) have in the property.

17      RCW 61.24.005 (2).

18

19
---

defraud or materially mislead any person, or engage in any unfair or deceptive practice
20    toward any person in the lending process; or obtain property by fraud or material
misrepresentation in the lending process;
21      (2) Knowingly make any misstatement, misrepresentation, or omission during the
22    mortgage lending process knowing that it may be relied on by a mortgage lender,
borrower, or any other party to the mortgage lending process;
23      (3) Use or facilitate the use of any misstatement, misrepresentation, or omission,
knowing the same to contain a misstatement, misrepresentation, or omission, during the
24    mortgage lending process with the intention that it be relied on by a mortgage lender,
borrower, or any other party to the mortgage lending process; or
25      (4) Receive any proceeds or anything of value in connection with a residential
26    mortgage closing that such person knew resulted from a violation of subsection (1), (2),
or (3) of this section.

Page 17 - *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1  ## IX.  INADEQUACY OF REMEDY AT LAW

2  61.  Defendants intend to proceed with a non-judicial foreclosure on February 26, 2016 despite

3  all the reasons alleged above which BAR them from doing so.  Plaintiff will suffer

4  irreparable injury if the foreclosure proceeds unabated.  Only a court-ordered injunction

5  will prevent defendants from proceeding to foreclose non-judicially on plaintiffs' property.

6  62.  Plaintiffs have a clear right to the relief sought because there is no other remedy that will

7  prevent the damage defendants, and each of them, seek to cause.

8  ## PRAYER FOR RELIEF

9  WHEREFORE, Plaintiffs respectfully pray that this court:

10  1. Assume jurisdiction over this case;

11  2. Enjoin defendants, and each of them, pending the outcome of this action, from

12  initiating, continuing or in any way undertaking any foreclosure or other action, judicial or non-

13  judicial,  related to the property, title to the property or possession of the property known as 200

14  Coyote Lane, Castle Rock, Cowlitz County, Washington, until such time as all the parties have a

15  full and complete opportunity to be heard on the issues here and upon such terms and conditions

16  as the court deems just;

17  3.  Declare that no named defendant may foreclose on the property without first proving

18  its actual possession of the original documents expressing the obligation and its legal right to do

19  so and that no defendant holding the mortgage to secure "another obligation" may foreclose at all;

20  4.  Declare that no defendant participating in a pattern of criminal profiteering activity

21  may acquire any title to, or any right, interest, or equity in, the real property that is the subject of

22  this action thereby.

23  4. Declare that Plaintiff is entitled to full and unhindered possession of the property as

24  against any claims for foreclosure by defendants, or any of them, barring production of the

25  aforesaid proof; and

26  AFTER HEARING THE EVIDENCE, plaintiffs respectfully pray that the court:

5. Issue a permanent injunction prohibiting defendants, their agents, successors in interest

Page 18 – *COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1    or assigns from initiating, continuing or in any way undertaking any foreclosure or other action,

2    judicial or non-judicial,  related to the property, title to the property or possession of the property

3    known as 200 Coyote Lane, Castle Rock, Cowlitz County, Washington.

4         6.   Award plaintiffs a judgment for their expenses, costs, fees, and other disbursements

5    associated with the filing and maintenance of this action, including reasonable attorneys' fees

6    under any applicable law;

7         7.   Exercise continuing jurisdiction during the enforcement of its judgment;

8         8.   Grant such other and further relief as may follow from the entry of a declaratory

9    judgment; and

10        9.   Grant any further relief that this Court may deem just and proper.

11        DATED this ___ day of February, 2016.

12

13                              /s/
                                D. Lawrence Olstad
14                              Pro Se

15

16

17

18

19

20

21

22

23

24

25

26

D. Lawrence Olstad
Pro Se
105 NE 61st Ave. Apt 6
Portland, Oregon 97213
Cellular Telephone (503) 849-4635
email: larry@willowsky.net

1
1 OF 3

WHEN RECORDED MAIL TO:
**Quality Loan Service Corp. of Washington**
**C/O Quality Loan Service Corporation**
**411 Ivy Street**
**San Diego, CA 92101**

TS No.: WA-10-399108-SH
APN No.: WK31-04-008                          SPACE ABOVE THIS LINE FOR RECORDER'S USE
Title Order No.: 100662975-WA-GSI
Deed of Trust Grantor(s):  LINDA C MARTIN, LINDA CARLYLE MARTIN
Deed of Trust Grantee(s):  WASHINGTON MUTUAL BANK
Deed of Trust Instrument/Reference No.: 3096005

## NOTICE OF TRUSTEE'S SALE
Pursuant to the Revised Code of Washington 61.24, et seq.

I.      **NOTICE IS HEREBY GIVEN** that Quality Loan Service Corp. of Washington, the undersigned
Trustee, will on 2/26/2016, at 11:00AM at the main entrance to the Cowlitz County Administration
Building, 207 4th Avenue North, Kelso, WA sell at public auction to the highest and best bidder, payable in
the form of credit bid or cash bid in the form of cashier's check or certified checks from federally or State
chartered banks, at the time of sale the following described real property, situated in the County of **COWLITZ**,
State of Washington, to-wit:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF THE
SOUTHEAST QUARTER OF SECTION 31, TOWNSHIP 10 NORTH, RANGE 2 WEST OF THE
WILLAMETTE MERIDIAN; THENCE SOUTH 0°22'55" EAST 659.23 FEET TO THE CENTER
LINE OF A PROPOSED ROAD; THENCE SOUTH 89°58'45" EAST ALONG CENTER LINE OF
SAID ROAD 464.0 FEET TO THE CENTER LINE OF A CREEK KNOWN AS BAXTER CREEK;
THENCE NORTHEASTERLY ALONG CENTER LINE OF SAID CREEK TO A POINT IN
CENTER OF SAID CREEK 230.0 FEET SOUTH AND 580.0 FEET, MORE OR LESS, WEST OF
THE EAST QUARTER CORNER OF SAID SECTION 31, SAID POINT BEING ON THE SOUTH
LINE OF TRACT CONVEYED TO JAMES F. POMEROY BY DEED RECORDED JUNE 14, 1963
UNDER AUDITOR'S FILE NO. 568009; THENCE NORTH 89°56' WEST 367.0 FEET, MORE OR
LESS TO THE SOUTH WEST CORNER OF THE SAID POMEROY TRACT; THENCE NORTH
0°17' WEST 230.0 FEET ALONG THE WEST LINE OF SAID POMEROY TRACT; THENCE NORTH
NORTH LINE OF THE NORTH ONE HALF OF THE SOUTHEAST QUARTER OF SAID
SECTION 31; THENCE NORTH 89°55'20" WEST ALONG NORTH LINE OF SAID SOUTHEAST
QUARTER OF SECTION 31, A DISTANCE OF 351.14 FEET MORE OR LESS, TO THE POINT OF
BEGINNING.   EXCEPT THAT PORTION CONVEYED TO COWLITZ COUNTY UNDER
AUDITOR'S FILE NO. 821025043.

More commonly known as:
200 COYOTE LANE, CASTLE ROCK, WA 98611

which is subject to that certain Deed of Trust dated 8/30/2000, recorded 9/7/2000, under 3096005    records
of **COWLITZ** County, Washington, from L CARLYLE MARTIN AND LINDA C MARTIN,
HUSBAND AND WIFE, as Grantor(s), to CHICAGO TITLE INSURANCE, A WASHINGTON

**CORPORATION**, as Trustee, to secure an obligation in favor of **WASHINGTON MUTUAL BANK**, as Beneficiary, the beneficial interest in which was assigned by **WASHINGTON MUTUAL BANK** (or by its successors-in-interest and/or assigns, if any), to U.S. Bank Trust, N.A., as Trustee for LSF8 Master **Participation Trust**.

II.    No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the obligation in any Court by reason of the Borrower's or Grantor's default on the obligation secured by the Deed of Trust/Mortgage.

III.    The default(s) for which this foreclosure is made is/are as follows:
Failure to pay when due the following amounts which are now in arrears: **$136,638.47**

IV.    The sum owing on the obligation secured by the Deed of Trust is: The principal sum of **$233,484.20**, together with interest as provided in the Note from 7/1/2009 on, and such other costs and fees as are provided by statute.

V.    The above-described real property will be sold to satisfy the expense of sale and the obligation secured by the Deed of Trust as provided by statute. Said sale will be made without warranty, expressed or implied, regarding title, possession or encumbrances on 2/26/2016. The defaults referred to in Paragraph III must be cured by 2/15/2016 (11 days before the sale date) to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before 2/15/2016 (11 days before the sale) the default as set forth in Paragraph III is cured and the Trustee's fees and costs are paid. Payment must be in cash or with cashiers or certified checks from a State or federally chartered bank. The sale may be terminated any time after the 2/15/2016 (11 days before the sale date) and before the sale, by the Borrower or Grantor or the holder of any recorded junior lien or encumbrance by paying the principal and interest, plus costs, fees and advances, if any, made pursuant to the terms of the obligation and/or Deed of Trust, and curing all other defaults.

VI.    A written Notice of Default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

NAME
**L CARLYLE MARTIN AND LINDA C MARTIN, HUSBAND AND WIFE**
ADDRESS
**200 COYOTE LANE, CASTLE ROCK, WA 98611**

by both first class and certified mail, proof of which is in the possession of the Trustee; and the Borrower and Grantor were personally served, if applicable, with said written Notice of Default or the written Notice of Default was posted in a conspicuous place on the real property described in Paragraph I above, and the Trustee has possession of proof of such service or posting. These requirements were completed as of 8/28/2015.

VII.    The Trustee whose name and address are set forth below will provide in writing to anyone requesting it, a statement of all costs and fees due at any time prior to the sale.

VIII.    The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their interest in the above-described property.

IX.    Anyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

NOTICE TO OCCUPANTS OR TENANTS – The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the deed of trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are

not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

## THIS NOTICE IS THE FINAL STEP BEFORE THE FORECLOSURE SALE OF YOUR HOME.

You have only 20 DAYS from the recording date of this notice to pursue mediation.

**DO NOT DELAY. CONTACT A HOUSING COUNSELOR OR AN ATTORNEY LICENSED IN WASHINGTON NOW** to assess your situation and refer you to mediation if you are eligible and it may help you save your home. See below for safe sources of help.

### SEEKING ASSISTANCE

Housing counselors and legal assistance may be available at little or no cost to you. If you would like assistance in determining your rights and opportunities to keep your house, you may contact the following:

The statewide foreclosure hotline for assistance and referral to housing counselors recommended by the Housing Finance Commission: Toll-free: **1-877-894-HOME (1-877-894-4663)** or Web site: http://www.dfi.wa.gov/consumers/homeownership/post_purchase_counselors_foreclosure.htm.

The United States Department of Housing and Urban Development: Toll-free: **1-800-569-4287** or National Web Site: http://portal.hud.gov/hudportal/HUD or for Local counseling agencies in Washington: http://www.hud.gov/offices/hsg/sfh/hcc/fc/index.cfm?webListAction=search&searchstate=WA&filterSvc=dfc

The statewide civil legal aid hotline for assistance and referrals to other housing counselors and attorneys: Telephone: **1-800-606-4819** or Web site: http://nwjustice.org/what-clear.

If the sale is set aside for any reason, including if the Trustee is unable to convey title, the Purchaser at the sale shall be entitled only to a return of the monies paid to the Trustee. This shall be the Purchaser's sole and exclusive remedy. The purchaser shall have no further recourse against the Trustor, the Trustee, the Beneficiary, the Beneficiary's Agent, or the Beneficiary's Attorney.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

# NOTICE OF FORECLOSURE
### Pursuant to the Revised Code of Washington,
### Chapter 61.24 RCW

T.S. No.: **WA-10-399108-SH**

The attached Notice of Trustee's Sale is a consequence of default(s) in the obligation to **U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust c/o Caliber Home Loans, Inc. (fka Vericrest Financial, Inc.),** owner of the obligation secured by your Deed of Trust, which is currently held on behalf of the owner by **U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust,** the current Beneficiary.  Unless the default(s) is/are cured, your property will be sold at auction on **2/26/2016.**

To cure the default(s), you must bring the payments current, cure any other defaults, and pay accrued late charges and other costs, advances, and attorney's fees as set forth below by **2/15/2016** *(11 days before the sale date)*.  To date, these arrears and costs are as follows:

| | Currently due to reinstate on: 10/23/2015 | Estimated amount due to reinstate on: **2/15/2016** (11 days before the date set for sale.) |
|---|---|---|
| Total payments from 8/1/2009 | | |
| Total late charges | $103,714.16 | 103714.16 |
| Total advances | $6,067.36 | $6,067.36 |
| Trustee's Fee: | $25,274.45 | $25,274.45 |
| Trustee's Expenses: (Estimated Itemization) | $607.50 | $607.50 |
| Title Report | | |
| Additional Foreclosure Fees/Costs | $605.00 | $605.00 |
| Recording Fees | $0.00 | $0.00 |
| Service/Posting of Notices | $150.00 | $150.00 |
| Postage (actual and estimated) | $120.00 | $120.00 |
| Publication | $100.00 | $100.00 |
| | $0.00 | $1,000.00 |
| **TOTALS** | **$136,638.47** | **$137,638.47** |

To pay off the entire obligation secured by your Deed of Trust as of the **10/23/2015** you must pay a total of **$233,484.20** in principal, **$87,135.20** in interest, plus other costs and advances estimated to date in the amount of **$0.00.** From and after the date of this notice you must submit a written request to the Trustee to obtain the total amount to pay off the entire obligation secured by your Deed of Trust as of the payoff date.

As to the defaults which do not involve payment of money to the beneficiary of your Deed of Trust, you must cure each such default (as applicable).  Listed below are the defaults which do not involve payment of money to the Beneficiary of your Deed of Trust.  Opposite each listed default is a brief description of the action necessary to cure the default (if applicable) and a description of the documentation necessary to show the default has been cured.

| Default | Description of Action Required to Cure and Documentation Necessary to Show Cure |
|---|---|
| Delinquent property taxes | Payment in full to Obligee evidenced by a proper receipt. |
| Insurance premiums | Payment in full to Obligee evidenced by a proper receipt. |
| Advances made on senior liens | Payment in full to Obligee evidenced by a proper receipt. |
| Taxes and/or insurance | Payment in full to Obligee evidenced by a proper receipt. |
| Trustee's fees and expenses | Payment in full of the above listed Trustee's Fee and Expenses. |
| Any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security | Payment in full to Obligee evidenced by a proper receipt. |

All of the above defaults must be cured as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.

You may reinstate your Deed of Trust and the obligation secured thereby at any time up to and including **2/15/2016** *(11 days before the sale date)*, by paying the amount set forth or estimated above and by curing any other defaults described above. Of course, as time passes other payments may become due, and any further payments coming due and any additional late charges must be added to your reinstating payment. Any new defaults not involving payment of money that occur after the date of this notice must also be cured in order to effect reinstatement. In addition, because some of the charges can only be estimated at this time, and because the amount necessary to reinstate or to payoff the entire indebtedness may include presently unknown expenditures required to preserve the property or to comply with state or local law, it will be necessary for you to contact the Trustee before the time you tender reinstatement or the payoff amount so that you may be advised of the exact amount you will be required to pay.

Tender of payment or performance must be made to: Caliber Home Loans, Inc.

Payment or performance may be mailed to :
Quality Loan Service Corp. of Washington
C/O Quality Loan Service Corp.
411 Ivy Street, San Diego, CA 92101

Payment or performance may be dropped off at:
Quality Loan Service Corp. of Washington
108 1st Ave South, Suite 202
Seattle, WA 98104

Phone: (866) 925-0241 ext. 5318
**Sale Line: 916.939.0772 or Login to: http://wa.qualityloan.com**

AFTER **2/15/2016**, YOU MAY NOT REINSTATE YOUR DEED OF TRUST BY PAYING THE BACK PAYMENTS AND COSTS AND FEES AND CURING THE OTHER DEFAULTS AS OUTLINED ABOVE. The Trustee will respond to any written request for current payoff or reinstatement amounts within ten days of receipt of your written request. In such a case, you will only be able to stop the sale by paying, before the sale, the total principal balance **$233,484.20** plus accrued interest, costs and advances, if any, made pursuant to the terms of the documents and by curing the other defaults as outlined above.

You may contest this default by initiating court action in the Superior Court of the county in which the sale is to be held. In such action, you may raise any legitimate defenses you have to this default. A copy of your Deed of Trust and documents evidencing the security thereby are enclosed. You may wish to consult a lawyer. Legal action on your part may prevent or restrain the sale, but only if you persuade the court of the merits of your defense. You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.

The court may grant a restraining order or injunction to restrain a trustee's sale pursuant to RCW 61.24.130 upon five days notice to the trustee of the time when, place where, and the judge before whom the application for the restraining order or injunction is to be made. This notice shall include copies of all pleadings and related documents to be given to the judge. Notice and other process may be served on the trustee at:

Registered Agent: Sierra West, Quality Loan Service Corporation of Washington, 108 1st Ave. South, Suite 202, Seattle, Washington 98104, (866) 925-0241

If you do not reinstate the secured obligation and your Deed of Trust in the manner set forth above, or if you do not succeed in restraining the sale by court action, your property will be sold to satisfy the obligations secured by your Deed of Trust. The effect of such sale will be to deprive you and all those who hold by, through or under you of all interest in the property.

QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.





### QUALITY
**LOAN SERVICE CORP.**
Washington

108 1st Ave South, Suite 202 • Seattle, Washington 98104 • (866) 925-0241

August 31, 2015

SENT VIA USPS

D. Lawrence Olstad
105 N.E. Sixty-First Avenue Apt. 6
Portland, Oregon 97213

Re:   Borrower:  Linda C. Martin, L Carlyle Martin
      T.S. #:  WA-10-399108-SH
      Property:  200 Coyote Lane Castle Rock, WA 98611

Dear Mr. Olstad

We are in receipt of your letter dated August 26, 2015, which was directed to Quality Loan
Service Corp. of Washington ("Quality") and wish to respond. Although Quality is advancing a
non-judicial foreclosure pursuant to the requirements of the Deed of Trust ("DOT") and
Washington statutory authority, Quality has made no attempts to collect a debt and its role is
limited to the advancement of the non-judicial foreclosure. The debt which supports the
underlying foreclosure stems from the enclosed $222,952.00 Promissory Note dated August 30,
2000, which was secured by the above referenced property, as evidenced by the enclosed DOT.
The DOT identified Washington Mutual Bank as the original lender. On June 28, 2014, the
beneficial interest in the subject DOT was transferred from JP Morgan Chase Bank N.A.
(successor in interest to Washington Mutual Bank) to U.S. Bank Trust, N.A., as Trustee for
LSF8 Master Participation Trust.

Prior to being appointed Successor Trustee and issuing the Notice of Default, Quality received a
signed declaration stating under the penalty of perjury stating U.S. Bank Trust, N.A., as Trustee
for LSF8 Master Participation Trust is the actual holder of the Martin Promissory Note. A copy
of Promissory Note, Deed of Trust, Assignment of Deed of Trust and Declaration of Ownership
pursuant to RCW § 61.24.030 (7)(a) are attached for your review.

Based on the above, it is Quality's opinion that we have been properly appointed as the Trustee
and can advance the non-judicial foreclosure pursuant to the terms of the DOT and Washington
statutory authority. If you have further questions or concerns relative to the foreclosure being
advanced, please direct them to Quality at 108 1st Ave. South, Suite 202, Seattle, WA 98104 or
866.925.0241.

1

In the event you have additional questions or concerns not specifically addressed in this reply relative to this foreclosure you may contact me directly at 206.319.9054.

Cordially,

Robert W. McDonald, Esq.
General Counsel
Quality Loan Service Corp. of Washington

**Enclosures: Correspondence, Promissory Note, Deed of Trust, Assignment of Deed of Trust, Beneficiary Declaration of Ownership.**

2

T.S. No.:   WA-10-399108-SH

EXHIBIT _4_
PAGE _1_ OF _1_

# DECLARATION OF BENEFICIARY

## (Pursuant to RCW 61.24.030 (SB 5810))

The undersigned declares that it is the Beneficiary or the authorized Agent for the Beneficiary who is the actual holder of that certain Promissory Note or other obligation which is secured by the below referenced Deed of Trust, and hereby represents and declares further as follows:

1) I am an employee of Caliber Home Loans, Inc. and am duly authorized to make this declaration on behalf of U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust.

2) The real property involved is commonly known as 200 COYOTE LANE, CASTLE ROCK, WA 98611.

3) U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust is the actual holder of the Promissory Note dated 8/30/2000, in the principal amount of $222,952.00, which is secured by the Deed of Trust recorded in COWLITZ County under Auditor's File No. 3096005.

4) The Promissory Note has not been assigned or transferred to any other person or entity.

I declare under *PENALTY OF PERJURY* under the laws of the State of Washington, that the foregoing is true and correct, and that this declaration was executed this _20th_ day of _January_ 20 _15_ at _San Diego_ , _CA_ .

Dated: _01/20/2015_

U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust, By Caliber Home Loans, Inc., as its Attorney in Fact Beneficiary/Authorized Agent for Beneficiary

By: ~~_____~~

Its: ~~Default Service Officer~~

~~Theodore Schroeder Jr. a/k/a~~
~~Ted Schroeder~~

RECORDING REQUESTED BY
Washington Mutual Bank, FA
7255 Baymeadows Way
Jacksonville, FL 32256

EXHIBIT _5_
PAGE _1_ OF _2_

AND WHEN RECORDED MAIL TO:
Quality Loan Service Corp. of Washington
2141 5th Avenue
San Diego, CA  92101

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Loan No: 0039028618          APN: WK31-04-008          TS No: WA-08-147277-CM

## NOTICE OF TRUSTEE'S SALE
## PURSUANT TO THE REVISED CODE OF WASHINGTON
## CHAPTER 61.24 ET. SEQ.

I.       NOTICE IS HEREBY GIVEN that Quality Loan Service Corp. of Washington, the undersigned Trustee, will on 8/1/2008, at 11:00:00 AM at the main entrance to the Superior Courthouse, 312 S.W. First Avenue, Kelso, WA sell at public auction to the highest and best bidder, payable, in the form of cash, or cashier's check or certified checks from federally or State chartered banks, at the time of sale the following described real property, situated in the County of COWLITZ, State of Washington, to-wit:

For Legal Description See Attached

Commonly known as:
200 COYOTE LN
CASTLE ROCK, WA 98611

which is subject to that certain Deed of Trust dated 8/30/2000, recorded 9/7/2000, under Auditor's File No. 3096005, in Book xxx, Page xxx records of COWLITZ County, Washington, from L CARLYLE MARTIN AND LINDA C MARTIN, HUSBAND AND WIFE, as Grantor(s), to CHICAGO TITLE INSURANCE, A WASHINGTON CORPORATION, as Trustee, to secure an obligation in favor of WASHINGTON MUTUAL BANK, as Beneficiary, (only if current beneficiary different from original beneficiary)the beneficial interest in which was assigned by WASHINGTON MUTUAL BANK to  Washington Mutual Bank.

II.       No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the obligation in any Court by reason of the Borrower's or Grantor's default on the obligation secured by the Deed of Trust/Mortgage.

III.       The default(s) for which this foreclosure is made is/are as follows:

Failure to pay when due the following amounts which are now in arrears: $11,042.20

IV.       The sum owing on the obligation secured by the Deed of Trust is: The principal sum of $211,324.71,together with interest as provided in the Note from the 12/1/2007,and such other costs and fees as are provided by statute.

4

Loan No: 0039028618

T.S. No.: WA-08-147277-CM

EXHIBIT **5**
PAGE **2** OF **2**

V.      The above-described real property will be sold to satisfy the expense of sale and the obligation secured by the Deed of Trust as provided by statute. Said sale will be made without warranty, expressed or implied, regarding title, possession or encumbrances on 8/1/2008. The defaults referred to in Paragraph III must be cured by 7/21/2008 (11 days before the sale date) to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before  7/21/2008 (11 days before the sale) the default as set forth in Paragraph III is cured and the Trustee's fees and costs are paid. Payment must be in cash or with cashier's or certified checks from a State or federally chartered bank. The sale may be terminated any time after the  7/21/2008 (11 days before the sale date) and before the sale, by the Borrower or Grantor or the holder of any recorded junior lien or encumbrance by paying the principal and interest, plus costs, fees and advances, if any, made pursuant to the terms of the obligation and/or Deed of Trust.

VI.     A written Notice of Default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

NAME
L CARLYLE MARTIN AND LINDA C
MARTIN, HUSBAND AND WIFE

ADDRESS
200  COYOTE LN
CASTLE ROCK, WA 98611

by both first class and certified mail on 3/28/2008, proof of which is in the possession of the Trustee; and the Borrower and Grantor were personally served, if applicable, with said written Notice of Default or the written Notice of Default was posted in a conspicuous place on the real property described in Paragraph I above, and the Trustee has possession of proof of such service or posting.

VII.    The Trustee whose name and address are set forth below will provide in writing to anyone requesting it, a statement of all costs and fees due at any time prior to the sale.

VIII.   The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their interest in the above-described property.

IX.     Anyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

4